**IN THE FEDERAL DISTRICT COURT FOR THE DISTRICT
OF SOUTH CAROLINA**
Greenville Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA EX | ) | CASE NO.: 6:17-CV-2608-DCC |
| REL REYNOLD A.  MCCLAIN, RPH. | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| NUTRITIONAL SUPPORT | ) | |
| SERVICES, LP | ) | |
| | ) | |
| Defendant. | ) | |

---

## ORIGINALLY FILED IN CAMERA AND UNDER SEAL

---

## SECOND AMENDED COMPLAINT

(False Claims Act, 31 U.S.C. §§3729-3733)

**None of the allegations set forth in this Complaint are based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit or investigation, or from the news media.**

**HINNANT MEDICAL & LAW OFFICES, LLC**

*s/ C. William Hinnant, Jr. MD JD FCLM*

_____

C. William Hinnant, Jr. MD JD FCLM
S.C. Federal ID No. 9129
112 Essex Drive
Anderson, SC 29621
(864) 226-6132, Fax: (864) 226-2320

**ATTORNEY FOR RELATOR**

IN THE FEDERAL DISTRICT COURT FOR THE DISTRICT
OF SOUTH CAROLINA
Greenville Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA EX REL REYNOLD A. MCCLAIN, RPH. | ) ) ) | CASE NO.: 6:17-CV-2608-AMQ |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| NUTRITIONAL SUPPORT SERVICES, LP | ) ) ) | **SECOND AMENDED COMPLAINT** |
| Defendant. | ) ) | |

---

## PRELIMINARY STATEMENT

This lawsuit is based on the submission of false claims by Nutritional Support Services, LP ("NSS"), and/or certain Medicare Part D sponsors with which it was in privity, and/or its clients, various nursing homes and assisted living facilities within the State of South Carolina and perhaps in other states, specializing in the provision of long term care, to insureds of *inter alia* the federal Medicare, TriCare, Medicaid and Federal Employees Health Benefits Programs ("FEHPB") (collectively hereinafter "Federal Healthcare Programs" or "Federal Payers"). NSS also services certain assisted living facilities, providing medications to those residents thereof reimbursed by way of Medicare Part B.

Responsibility for these false claims lies with the Defendant in this matter, NSS, doing business as "Network Healthcare" of 1200 Woodruff Road, Suite C28, Greenville, SC, 29607. There, NSS operates an institutional wholesale pharmacy, chiefly providing prescription medications to health care facilities and organizations that provide assisted living and/or long-term nursing care throughout South Carolina, most notably to National Healthcare Corporation ("NHC") facilities in this state.

NSS provides similar services in other states from other locations.  Management at the Greenville location includes NSS employees, James L. "Jimmy" Sain, a registered pharmacist and Wayne Adams, NSS' Pharmacy Manager, Sain's nephew and the Relator's immediate supervisor.  Both had knowledge and were complicit of the scheme described herein.  Relator by information and belief, believes that the fraud as pled is being perpetrated at all NSS locations in multiple jurisdictions in the United States of America, throughout NHC's various service areas including from two locations in Tennessee and one in Missouri, this assertion based upon certain less costly substituted medications at issue being purchased corporately, not solely by the Greenville location.

In thousands of cases, hundreds on a daily basis, NSS has charged the Federal Healthcare Payer Programs for medications dispensed to federal beneficiaries using fraudulent NDC numbers that resulted in inaccurate and illegal compensation to NSS as Claimant and/or derivative beneficiary of the scheme through third-party contractors.  The medications provided to the facilities and subsequently to federal insureds, were virtually always, a less-expensive generic than that medication charged to the Federal Payer and/or other third-party indemnitors, NSS thereby having a far lower cost basis in the drugs billed and collecting on the claims at the expense of the Federal Healthcare Programs and the American public at large, wrongfully increasing its profit margin.

NSS, to its benefit, was compensated to excess based upon the actual medication administered having a lower cost basis that the one billed on the claims forwarded to the insuring relevant Federal Payers.  In the minority of cases wherein a clearly less expensive generic alternative was not substituted, NSS in all cases billed using an NDC that did not match that of the medication actually reaching the federally-insured patients, still a false claim for payment and potentially dangerous to those patient-insureds' health.  While in the case of Medicare Part D,

payment from the Government may have gone directly to the Plan D Sponsor, NSS still received excess compensation derivatively from the respective sponsor by whom it would be reimbursed.

As such, NSS knowingly presented, or caused to be presented, numerous fraudulent claims for payment to the Federal Healthcare Programs, knowingly certified, or caused to be certified, false records to get fraudulent claims paid, and knowingly concealed, or caused to be concealed, its obligation to repay and return those Federal Payers' funds, to which it was not rightfully entitled in its provision of prescription drug services.

Each such claim represents an independent violation of the False Claims Act at 31 U.S.C. § 3729 et seq. as pled, *infra*. Additionally, the Relater was pretextually terminated by NSS in retaliation for bringing the fraud to the attention of Manager, James L. Sain, RPh on multiple occasions and attempting to correct the fraud. His protected activity as contemplated under 31 U.S.C. § 3730(h)(1) in attempting to remedy the fraud on multiple occasions began in 2014 and continued into 2016 up to his date of termination. Relator is in possession of information related to some of the specific false claims presented for payment.

The Relator, Reynold L. McClain, RPh., acting on behalf of and in the name of the United States of America, brings this civil action under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§3729-3733, and alleges as follows:

## **PARTIES**

1.    That Relator is a registered pharmacist and former dispensing employee of NSS, who has unique first-hand knowledge of its unlawful practices, including, with specificity, personal knowledge of its systematically defrauding of the Federal Healthcare Programs through its dispensing and filing claims for medications not having correct National Drug Code ("NDC") numbers. He has specific examples of the fraudulently-claimed medications, billed by bar code with the packet actually dispensed containing a "disclaimer" denoting that the medication was

the same ordered, but that it might appear different, this to divert attention away from the fact that the incorrect higher-reimbursing NDC was actually represented on the only bar code on the packaging.

2.    That NSS is a Tennessee Limited Partnership with its principle place of business at 9000 Executive Park Drive, Suite A-301, Knoxville, TN, 37923-4685 and is authorized to do business in South Carolina and in other states.    **The physical address of NSS d/b/a Network Healthcare in South Carolina is 1200 Woodruff Road, Suite C28, Greenville, SC, 29607.**

<u>**JURISDICTION AND VENUE**</u>

3.    That this Court has jurisdiction over this Complaint's parties and subject matter pursuant to 28 U.S.C. §§1331 and 1345, and false claims jurisdiction under 31 U.S.C. §3732(a) as NSS transacts business from its office in Greenville County (from which the false claims as pled here originated), marketing to other areas and having substantial contacts throughout the State of South Carolina, chiefly through contracting nursing homes/long term care facilities and assisted-living facilities in most cases managed and/or owned by NHC .    This Court has supplemental jurisdiction over any related state law claims pursuant to 28 U.S.C. § 1367.

4.    That venue is properly in the Federal District of South Carolina, Greenville Divison, under 28 U.S.C. §1391 as the Defendant resides in Greenville County, a substantial part of the events or omissions giving rise to the claim occurring in same county.  Specifically, for this case, false claims venue in this district is proper also pursuant to 31 U.S.C. §3732(a), 28 U.S.C. §1391(b) and (c).

5.    That to Relator's knowledge, jurisdiction here is not barred by 31 U.S.C. §3730(e), nor the parallel provisions of any applicable state false claims acts: there is no civil suit, criminal or administrative proceeding involving the allegations and transactions herein pled to which the government is a party.

6.     That there has been no "public disclosure" of these allegations or transactions; such that Relator is an original source of the information contained herein.

## FACTUAL BACKGROUND

7.     That virtually all of the Federal Payer Program beneficiaries on whose behalf NSS derivatively filed false claims for payment based upon the Greenville location's actions were South Carolina residents, although residents of other states were also involved.

8.     That Medicare Part D Sponsors, Medicare and Medicaid carriers were also improvidently billed for prescription drug events filled by NSS Greenville (but by information and belief also at the three other NSS locations) and fraudulently claimed for reimbursement, as many of the involved nursing home and assisted living facility patients met the income and asset tests requirements to qualify for Medicaid after exhausting their Medicare long-term care benefits (100 days).

9.     That therefore, South Carolina state funds were also fraudulently claimed such that the South Carolina Department of Health and Human Services should be reimbursed.  Additional remuneration in excess of fair market value inured to the benefit of NSS at its Greenville location and also at other NSS locations nationwide as a result of the methodology of the fraud described herein.

10.     That by information and belief, millions of federal healthcare dollars were converted as a result of the fraud.

11.     That this is an action to recover damages and civil penalties brought by Pharmacist Reynold A. "Rey" McClain (hereinafter "Relator"), an individual, on behalf of the United States of America against his former employer, NSS, arising from an unlawful scheme to defraud the United States of America, Medicare Part D Sponsors, Medicaid and the other Federal Healthcare

Programs, in particular, through submission of false and fraudulent Medicare, TriCare, FEHBP and Medicaid claims.

12.    That all such claims were submitted for reimbursement directly or indirectly to the United States Government (including state money contributions in the case of Medicaid insureds) in violation of the False Claims Act, as amended 31 U.S.C. §3729, *et seq*.  ("False Claims Act or FCA").  NSS' fraudulent scheme implemented in Greenville and at other NSS locations was used to churn false claims for payment, in some cases, actually paid to an intermediate entity such as a Medicare Part D sponsor or another third party, in all cases, with unearned benefit inuring to NSS upon its (or the actual long-term care facilities') claim for reimbursement.

13.    That beginning in 2014 and calling for it to immediately halt, Relator brought up his recognition of the scheme to NSS Management (Sain), who promised him it would be remedied, yet to the date of Relator's Complaint's being served, the false claims persisted in being filed.

14.    That further, Sain terminated Relator's employment when his complaints and call for change continued into 2016, that termination pretextually based upon his receipt of a legacy medication prescribed for him by a physician (celecoxib) from a fellow employee, when in actuality, Relator was terminated to injure his reputation in retaliation, based upon his knowledge of, objection to, and failure to participate quietly in the scheme.

15.    That Relator's termination was therefore pretextual.

16.    That all the alleged acts pled herein arose in the State of South Carolina, although citizens of and NHC facilities in other states are also involved, Relator, by information and belief, of the opinion that NSS, as a subsidiary of NHC Healthcare, provided pharmacy service to facilities in other states through its other locations and that the fraud, as pled, is widespread throughout NHC's service area served by NSS.

17.    That the same course of substitution of medications having NDCs different than those actually claimed was perpetrated at other NSS locations in Tennessee and Missouri such that the number of false claims is exponentially greater than those solely originating in the Greenville, South Carolina area.

18.    That to Relator's knowledge, NSS has no False Claims Act history and is a wholly-owned subsidiary of National HealthCare Corporation (NHC), 100 East Vine Street, Murfreesboro, TN 37130, publicly-traded on the New York Stock Exchange and with a market capitalization in excess of $1.1 billion.

19.    .That the Food and Drug Administration requires that every drug manufactured and dispensed have its own unique NDC.  It is a violation of federal and state law and professional regulations and practice standards to dispense a drug not matching the NDC on the prescription label and to bill as if it did.  Dispensing an incorrect medication can also be obviously unsafe to the patient receiving it.

20.    That by regulation and statute, the Center for Medicare and Medicaid Services ("CMS") payments to pharmacies for prescription medications are predicated upon the NDC of the drug dispensed by the pharmacy.  When a pharmacy fills or refills a prescription , CMS requires that it submit an accurate Prescription Drug Event ("PDE") Record, submission of same a condition of payment requiring certification to CMS of the NDC of the medication dispensed and the dispensing entities compliance with relevant federal healthcare law and regulations.

21.    That instantly, NSS, by way of PDE Records, directly and/or indirectly submitted, or caused to be submitted, fraudulent claims to the Federal Payers for medications having NDCs that were not identical to those dispensed to the patient-insureds hundreds of times daily as the illegal and fraudulent substitution occurred with every medication for every new patient-insured

admitted in the preceding 24 hours and likewise any time a change in medications was made, all over a period of at least over seven years.

22.     That while NSS dispensed on a routine seven (7) day cycle, the fraudulent medications were utilized when a patient-insured required medication immediately and before their routine maintenance medications could be entered into and dispensed using NSS' automated packaging system ("APS") known as the TCGRX.  Those initially provided medications to all newly-serviced patients and those medication changes made at any time by an existing  patient's treating provider were in virtually all cases, substituted with less expensive generic medications that have NDCs different than those claimed for billing purposes.

23.     That NSS used a machine-generated solid white label and green notice sticker placed on the medications fraudulently dispensed explaining that, "THIS IS THE SAME MEDICATION YOU HAVE BEEN GETTING.  COLOR, SIZE OR SHAPE MAY APPEAR DIFFERENT".  The solid white label included the truthful NDC of the medication dispensed while another yellow and white label displayed the NDC of the medication actually claimed with a corresponding fraudulent bar code, on the HCFA 1500 form or electronic equivalent through which NSS or its third party contractor submitted said claim to the Government, that latter medication to be dispensed by the TCGRX when the medication later went into maintenance use no less than one week later, but frequently significantly later.

24.     That NSS then fraudulently and despite it being illegal and a condition of reimbursement by CMS, certified to the truth and accuracy of the NDC of the medications dispensed for use by the Federal Program insureds (despite its not being the one initially received by the patient), receiving payment for the medication later dispensed correctly once the patient was synchronized on the TCGRX automated system.  CMS will not, absent fraud and

concealment of the medication actually dispensed, pay a claim falsely reporting the NDC of the drug dispensed.

25.    That instantly said claims were paid.

26.    That the fraudulent certification of compliance by NSS and/or derivatively by any intermediary, or Medicare Part D Sponsor was particularly to conceal the obligation NSS would have to repay the overpayment by the involved Federal Payer Program and likewise to report the reason for the overpayment.

27.    That NSS could not report the reason for its receipt of overpayment, as same would be admission of the filing of thousands of false claims with resulting penalties.

28.    That NSS at its Greenville location and at others, since at least May 2011 to the the time of Relator's Complaint being served, has used its system/methodology to file thousands of false PDE claims directly, or indirectly, with the Federal Healthcare Programs and receive payment for those false claims and to avoid its repayment obligation to them, all the while potentially jeopardizing patient safety, same occurring with the knowledge and approval of its management and with admission to Relator by James "Jimmy Sain" of the fraud's ongoing at least into calendar year 2018

29.    That under the provisions of 31 U.S.C. §3730(b)(2), Relator's Complaint was filed *in camera* and remained under seal for a period of over sixty (60) days and was not served on the Defendant until the Court so ordered.  The Government did not elect to intervene, or proceed, with the action after receipt of both the Complaint and the material evidence and information establishing this cause of action.  This did not go the merits of the case, positively or negatively, which the Government has made clear to the Defendant.

30.    That Relator, Reynold A. McClain, RPh., is a citizen and resident of the United States of America and the State of South Carolina suing in the name of and on behalf of the United

States of America. From approximately May 24, 2011 until August 23, 2016, a period of over five years, Relator was an employee of NSS as an employed pharmacist, having personal knowledge of the operational, as well as billing and collections practices of NSS, where he staffed the pharmacy and filled medication prescriptions for nursing home, long-term care and assisted living facility patients on orders from individual attending health care providers.

31.    That Relator observed NSS' employees' practices as to the filing of claims with the Federal Healthcare Programs and knows that it is responsible for making, or causing to be made, and submitting, or causing to be submitted, fraudulent claims to them, for prescription medications administered to federal beneficiaries in nursing homes and/or assisted living facilities under the scheme as pled, *supra*.

32.    That the medications claimed were not received by the insureds at that time, who instead were administered in virtually all cases, lower-cost alternatives, in an attempt on the part of NSS to receive increased remuneration/reinbusement and improve its profit. Relator is aware that these practices described herein and going back for a period of at least seven or more years, were ongoing as of the time of his Amended Complaint's being filed and served through ongoing communication with current NSS employees. His assertions are based upon personal knowledge and he swears to the truth thereof under penalty of perjury.

33.    That Relator has direct and independent knowledge within the meaning of 31 U.S.C. §3730(e)(4)(B) of the information on which the allegations set forth in his Complaint were based and he has voluntarily through his attorney provided the information to the Government by way of a Disclosure prior to filing his Complaint.

34.    That as required by 31 U.S.C. §3730(a)(2), Relator has provided to the Attorney General of the United States and to the United States Attorney for the District of South Carolina, simultaneous with the initial filing of his Complaint, a statement of material evidence disclosing

information related to that Complaint, the fraudulent billing and false claims submitted, or caused to be submitted by NSS.

35.    That Defendant NSS provides medical and healthcare services to the public and receives substantial funds directly or indirectly from the Federal Payer Programs.  All submissions by it directly, or any of its customers, providers, contractors or sponsors acting upon representations made by NSS to the Federal Payer Programs for payment, or reimbursement, involve a representation and certification that this Claimant will  abide by and has abided by, and that they individually will adhere to and have adhered to, all of the statutes, rules, and regulations governing the Medicare, TriCare, FEHBP and Medicaid programs.

36.    That NSS fraudulently certified this compliance to conceal its repayment and reporting obligation to the Government, a so-called "reverse" false claim.

37.    That all of the actions attributed to NSS in this Complaint were taken by its employees and/or agents, acting within the scope of their employment and/or agency and with full knowledge of management, James L. "Jimmy" Sain knowing of, admitting to and participating personally in the fraud along with NSS' Wayne Adams.

38.    That it is believed that any involved third-party facilities billing payers, or Medicare Part D sponsors were innocent participants in the scheme as they did not realize that the generally more expensive medications actually claimed were never received by the patient-beneficiaries, who instead received in virtually all cases, a less expensive and potentially dangerous generic substitute with a different NDC.

39.    That NSS knew or should have known of the fraud at all of its locations.

## APPLICABLE REGULATORY BACKGROUND

40.    That the United States Department of Health and Human Services (hereinafter "HHS") acting by and through CMS, is an agency of the United States of America responsible for

administering the federal Medicare Program, *see 42 U.S.C. §1395, et seq.*, under which healthcare facilities and providers (such as NSS and/or entities in privity with it) may be reimbursed with federal funds for services provided to eligible patients, or Medicare beneficiaries.

41.      That the Medicare Program which provides federal reimbursement for medically necessary services and supplies used by eligible persons, or Medicare beneficiaries ("beneficiaries", "insureds" or "patients") was established in 1965 by Title XVIII of the Social Security Act, 42 U.S.C. §1395, *et seq*. Medicare health care reimbursement is governed by statute and by regulations issued by HHS.  The program was designed to be a health insurance program and provide for payment of inpatient and outpatient medical services, including payment for the filling of prescriptions and durable medical equipment to persons over 65 years of age and others qualifying by way of disability, or certain other diagnoses under its terms and conditions.

42.      That under Medicare, CMS provides reimbursement for the use of approved prescription medications under more than one relevant Part of the program:  NSS primarily receives reimbursement from Medicare under Parts A and D of the program with some reimbursement through Part B.

43.      That under Part A, CMS reimburses claimants based upon actual cost data submitted by healthcare facilities in their Annual Medicare Cost Report to CMS.  Relevant to this matter, same would be reported by a facility as drugs purchased from NSS (but in the case of initial or change-over NSS-provided medications, claimed fraudulently with reimbursement by the Government to NSS or an entity in privity with it).

44.      That claims submitted for payment once the newly-prescribed medications were switched over to the automated TCGRX packaging system would then no longer be fraudulent.

45.     That in those cases wherein fraudulently substituted medications were dispensed to Part A beneficiaries in NHC-owned or managed facilities, NHC, the parent of NSS would benefit as the NSS cost basis in those medications was virtually always lower.

46.     That under Medicare's Part D, a facility orders its medications from NSS and the latter then bills the Part D Provider or Sponsor ("PDP") for the drug. CMS advances funds monthly to the PDP on the condition that the latter accurately submits the price paid by it for each prescription dispensed to CMS.

47.     That instantly, NSS in virtually all cases reported paying more for the drugs dispensed than it in reality paid, because it actually dispensed a less-expensive generic, increasing its profit margin (and that of NHC) by thereafter receiving increased reimbursement from Medicare Part D Sponsors, the Government itself, and/or other third-party payers.

48.     That the Medicaid program was similarly established in 1965 by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v as a means-tested program providing health care to the indigent that is jointly funded by the respective state and federal governments through taxpayer revenue and administered by the individual states with CMS oversight and the provision of certain federal matching funds. It is overseen by HHS through CMS and designed to assist states in providing medical care, including the filling of prescriptions, to the financially needy who meet its qualifications.

49.     That under Medicaid, NSS would temporarily submit false claims for medications not dispensed to beneficiaries either directly to the State Department of Health and Human Services, or to a State-approved Medicaid Managed Care entity. These would be paid directly by either of the above according to an approved Medicaid covered drug schedule.

50.     That CMS makes quarterly monetary transfers to the state to reimburse it for the federal share of the Medicaid expenditures occurring during that time period (up to 40%). To

receive such reimbursement, the state must submit a quarterly Medicaid expenditure report to CMS as to its Medicaid costs during that period. NSS' false claims would increase reimbursement to the respective state by the Government, those monies passing through to it by way of unearned Medicaid overpayments that it failed to report and actively concealed by way of fraudulent certification.

51.    That CMS is responsible for the administration of the Medicare Programs and contracts with private companies in each state known as "intermediaries" or "carriers" to administer Parts A and B of Medicare, Medicaid being similarly managed. In South Carolina, Medicare is administered by Palmetto Government Benefit Administrators ("Palmetto GBA") and certain managed care contractors, while Medicaid is now virtually entirely administered by managed care contractors through the S.C. Department of Health and Human Services.

52.    That the FEHP is administered by the U.S. Office of Personnel Management to cover federal employees. NSS submitted some false claims for medications it did not dispense to those program's insureds and received overpayments directly from those entities never reporting the overpayment, nor the reason for it, to the administering Government agency, further fraudulently certifying compliance with all relevant applicable regulations, statutes and conditions of participation.

53.    That TriCare (formerly CHAMPUS) is the civilian health and medical program of the United States' Uniformed Services and is administered by the Department of Defense ("DOD"). In response to the DOD Appropriation Act for Fiscal Year 1994, TriCare was implemented as a nationwide managed care program for Uniformed Services personnel to receive health care services, generally from non-governmental entities. NSS submitted some false claims generated for medications never dispensed during the relevant claimed period to TriCare insureds,

certifying compliance, yet never reporting overpayments it received, nor any reason for such overpayment as required by law.

54.     That when pharmacies such as NSS request payment from Medicare, Medicaid, TriCare and/or the FEHP for services provided to these program's beneficiaries, they are required to submit their claim for payment to the relevant carrier on a proper claim form designated by CMS as the HCFA 1500, or more recently the CMS 1500 form. *See 42 C.F.R. §424.32.*   Such claims are, in rare cases submitted on paper, but now far more frequently, electronically and NSS, in this matter, submitted these claims fraudulently, almost always electronically.

55.     That under the FCA, 31 U.S.C. § 3729(a)(1)(A), "knowingly" presenting or causing to be presented to the United States, any false or fraudulent claim for payment is a violation of federal law for which the government my recover three time the amount of damages it sustains and a civil monetary penalty of between $5500.00 and $11,000.00 per claim.  Many states have parallel provisions.  South Carolina does not.

56.     That NSS violated 31 U.S.C. § 3729(a)(1)(A) through the scheme as pled.

57.     That under 31 U.S.C. § 3729(a)(1)(B), "knowingly" making or causing to be made a false record or statement to get a false or fraudulent claim approved by the government is a violation of federal law for which the government my recover three time the amount of damages it sustains and a civil monetary penalty of between $5500.00 and $11,000.00 per claim. Many states have parallel provisions.  South Carolina does not.

58.     That NSS violated 31 U.S.C. § 3729(a)(1)(B) through the scheme as pled.

59.     That under 31 U.S.C. § 3729(a)(1)(G), any person, including any legal person, who "knowingly" makes, uses, or causes to be made, or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government is a violation of federal law for which the government may recover three time the amount of

16

damages it sustains and a civil monetary penalty of between $5500.00 and $11,000.00 per claim. Many states have parallel provisions but again not South Carolina.

60.     That NSS violated 31 U.S.C. § 3729(a)(1)(G), through the scheme as pled, particularly by fraudulently certifying its claims complaint when in fact, they were false, fraudulent and solely for the purpose of procuring overpayment by the Government, the latter in this case materially impacted by the false certification in that it paid these false claims.

61.     That a "claim" under the FCA includes any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient, if the government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested. 31 US.C. 3729(b)(2).

62.     That in all cases involving "transitional" medications (that is those provided to federal payer insureds prior to NSS conversion of those patient to automatic pill packaging), claimed by NSS hundreds of times daily, these "claims" were false and fraudulent, not rightfully reimbursed by the federal payers.

63.     That to establish liability under the FCA[1], the government or a whistleblower (Relator) must prove:

> **a.      That there was a "claim," statement, or conspiracy to defraud;**
> **b.      That the claim was submitted to the government or would be paid, in whole or in part, from funds from the government;**
> **c.      That the claim was submitted by defendant, or that defendant caused it to be submitted;**
> **d.      That the item or service represented in the claim was not provided as claimed or that the claim was false or fraudulent or the statement is "material to a false or fraudulent clam;" and**
> **e.      That the defendant knew or should have known that the claim or statement was false – including acting with deliberate ignorance or reckless disregard for the truth or falsity.**

---

[1] 31 U.S.C. §§ 3729-3733.

**NATIONAL DRUG CODES**

64.     That HHS, through the FDA, requires that every drug have an NDC, 21 C.F.R.

207.25.  The FDA assigns an NDC to every drug manufactured and sold to the public, 21 C.F.R.

207.35.

65.     That the NDC is a unique three-segment number used as a universal product

identifier for human drugs in this country.  The code is present on all prescription medication

packages and inserts in the United States.  The three segments of the NDC identify the labeler or

manufacturer, the product and the commercial package size.



The first set of numbers in the NDC identifies the labeler (manufacturer, packager, or

distributor). The second set of numbers is the product code, which identifies the specific

strength, dosage form (i.e. capsule, tablet, liquid) and formulation of the drug for a specific

manufacturer.  The third set is the package code, which identifies package sizes and types.  The

labeler code is assigned by the FDA, while the product and package codes re assigned by the

labeler.

66.     That the FDA requires that every prescription drug "must have a bar code that

contains at a minimum, the appropriate NDC in a linear bar code." 21 C.F.R. 201.25(c)(1).

Pharmacists nationwide use the NDC because it is the only medication identifier that confirms

with certainty that the medication being physically dispensed is in fact identical to the

medication on the prescription label and identical to the medication being billed to the payer. With all transitional medications, at least dating back to 2011, NSS claimed using a bar code not identifying the medications it dispensed to federally insureds during their transition to APS.

67.    That NSS, on the "transitional" medications it dispensed to newly-admitted patients or those whose physicians ordered new medications, generally used the following labeling:



a.  The yellow and white label contains the name, NDC and bar code of the medication claimed on the CMS-1500 form;

b.  The green label warns the patient and/or dispensing staff that the medication is the correct one but that it may appear different than what the patient had been receiving;

c.  That the white packaging containing the actual pills demonstrates the same medication name, but a different NDC, that of a lower cost generic.

## CMS PHARMACY PAYMENTS ARE BASED ON THE NDC

68.    That CMS bases its payment for prescription drugs on the NDC number and NDC quantity for the drug dispensed and the NDC reported to the CMS must match the drug dispensed.  Billing CMS based on an NDC number that is different from the NDC of the drug dispensed is a fraudulent billing.

69    That as such NSS engaged in fraudulent billing.

## MEDICARE

70.    That HHS mandates that CMS billings be based on certain medical data code sets, 45 C.F.R. 162.1000.  For pharmacy drug transactions paid by CMS, HHS requires that the pharmacy use "NDCs, as maintained and distributed by HHS." 45 C.F.R. 162.1002(b)(2)(i) and (c)(1).  Thus by regulation, the NDC is the basis for all CMS drug payment transactions.

71.    That in the case of transitional medications, NSS fraudulently billed and collected overpayments from CMS.

72.    That CMS has specific requirements for data that must be submitted by pharmacies in order to get paid by CMS.  42 C.F.R. 423.322 confirms that "Payments to a Part D sponsor are conditioned upon provision of information to CMS that is necessary to carry out this subpart, or as required by law."  NSS provided fraudulent information to Medicare Part D providers and to the Government directly violative of 42 C.F.R. 423.322.

73.     That pursuant to that regulation, on April 26, 2006, CMS issued a document entitled "Instructions: Requirements For Submitting Prescription Drug Event Data."  CMS explains in the Introduction:

> **As a condition of payment, all Part D plans must submit data and information necessary for CMS to carry out provisions... (citing 42 C.F.R. 423.322).  This document describes how CMS will implement the statutory payments mechanisms by collecting a limited subset of data elements on 100 percent of prescription drug "claims" or events....**
>
> **Every time a beneficiary fills a prescription covered under Part D, plans  must submit a summary record called the Prescription Drug Event (PDE) record to CMS. The PDE record contains prescription drug cost and payment data that will enable CMS to make payment to plans and otherwise administer the Part D benefit....**
>
> **The submitted data components fit together to allow calculation of payment under the four legislated payment mechanisms.**

74.     That CMS goes on to specify the data elements that must be correctly reported in every PDE record submitted to CMS for payment: "In this section we list the required data elements that must be submitted in PDE records for payment."  NSS provided fraudulent PDE information and data to Medicare Part D Sponsors, or to the Government directly, as to all federal insureds receiving transitional medications at least since 2011 up to the date of this action's service upon the Defendant.

75.     That the PDE has a mandatory field to confirm that the drug was dispensed:

**15. Product/Service ID**
**This field identifies the dispensed drug using a National Drug Code (NDC).  NDC will be reported in NDC11 format.**

76.     That NSS by providing fraudulent NDC's for the transitional medications it dispensed was responsible for this portion of the PDE being fraudulent.

77.     That by filing the PDE record with CMS, the recipients of Medicare Part D payments are certifying that "the claims data" submitted is "accurate, complete and acknowledge

21

that the claims data will be used for the purpose of obtaining Federal reimbursement." 42 C.F.R. 423.505(k)(3).

78.     That NSS fraudulently certified those claims for "transitional" medications dispensed to federal payer insured at a minimum, during the relevant period as pled and did so with knowledge of said falsity, the fraud continuing into the summer of 2018.

79.     That NSS impliedly falsely certified all its claims to the Government directly or by way of third parties such as Medicare Part D sponsors during the relevant period as pled, *supra*.

80.     That every drug has its own unique NDC, the FDA requiring that the label of every prescription drug product "must have a bar code that contains, at a minimum, the appropriate National Drug Code (NDC) number in a linear bar code." 21 C.F.R. 201.25(b)(1) and (c)(1).

81.     That CMS requires as a condition of payment that the NDC of the drug dispensed be reported in the PDE.  It is a violation of CMS's conditions of payment to submit a PDE record certifying to a false NDC that is not the NDC of the drug dispensed.

82.     That NSS committed this violation hundreds of times on a daily basis during the relevant time period as pled.  The bar codes read by NSS for purposes of claims processing for each fraudulent PDE was not the bar code indicating the correct NDC of the medication actually dispensed to the patient-insureds.

## MEDICAID

83.     That Congress specifically requires pharmacies to use NDC codes as the basis for Medicaid billing.  Referring to the payment for outpatient drugs through the Medicaid Drug Rebate Program, Congress mandated that

> **Not later than January 1, 2007, the information shall be submitted under subparagraphs (A) [for single source drugs] and (B)(ii) [for multiple source drugs] using National Drug Code codes unless the Secretary specifies that an alternative coding system should be used.**

22

42 U.S.C. 1396r-8(a)(7)(C).

84.    That the Secretary of DHHS has not specified any alternative to the NDC System.

85.    That NSS violated this provision as to Medicaid during the relevant time period as pled and falsely certified its regulatory compliance to all state agencies dealing with such claims.

86.    That as such, all of NSS' Medicaid claims are impliedly falsely certified.

87.    That the Medicaid Drug Rebate Program requires drug manufacturers to enter into a national rebate agreement with CMS in exchange for State Medicaid coverage of the manufacturer's drugs.  The Rebate Program helps offset the federal and state costs of outpatient prescription drugs dispensed to Medicaid patients.  All 50 states and the District of Columbia cover prescription drugs under the Medicaid Drug Rebate Program.

88.    That the efficacy of the Rebate Program depends on the use of the correct NDC by the pharmacy and physician involved.  Every State has instructions on how to comply with the requirements of the CMS Rebate Program.  South Carolina has issued such guidance, same making it clear that valid NDC numbers are required and that billing for one manufacturer's product and dispensing another is prohibited.

89.    That CMS receives rebates from manufacturers for most outpatient prescriptions, same calculated using NDC codes.  For the Rebate Program to function as Congress mandated, CMS must receive the correct NDC information for every prescription claim.  The NDC submitted to Medicaid must be the correct NDC for the drug and bottle size located on the package, or container from which the medication was dispensed.  The reporting of a NDC other than that of the drug dispensed violates a CMS condition for payment, for which a claim will be denied if CMS learns of the false NDC being utilized.

90.     That NSS reported an incorrect NDC, not matching those "transitional" medications actually dispensed to federal payer beneficiaries during the relevant time period as pled ,violative of Congress' mandate as to the Rebate Program.

### STATE PHARMACY BOARDS

91.     That the various State Pharmacy Boards also require the use of the NDC.  S.C. Code § 39-23-40(a)-(b) states:

> **A drug or device shall be deemed to be misbranded:**
> **(a)  If its label is false or misleading in any particular.**
> **(b)  If in a package form unless it bears a label containing (1) the name and place of business of the manufacturer, packer, or distributor; and (2) an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count; provided, that reasonable variations shall be permitted under regulations issued by the Commissioner of Health and Environmental Control or issued under the Federal act. Provided, further, that in the case of any drug subject to § 39-23-50(b)(1), the label shall contain the name and place of business of the manufacturer of the finished dosage form and, if different, the name and place of business of the packer or distributor. For the purpose of this paragraph, the finished dosage form of a drug is that form of the drug which is, or is intended to be, dispensed or administered to the ultimate user upon prescription or as otherwise dispensed by the pharmacist.**

92.     That within the S.C. Pharmacy Practice Act, S.C. Code § 40-43-86 informs strict labeling and dispensing requirements clearly mandating the inclusion of information conveyed in the NDC, such that failure to essentially meet the Rebate Requirements would be construed as a violation of state law.

93.     That NSS and specifically James "Jimmy" Sain, a Registered Pharmacist, violated state law and the Pharmacy Practice Act, potentially subjecting the latter as a licensee to discipline including licensure revocation.

### BILLING CMS FOR A DRUG DIFFERENT FROM THE DRUG DISPENSED IS FRAUD

94.     That the Medicare Program Integrity Manual ("MPIM") at § 4.2.1 gives the following examples of Medicare fraud:

> **The most frequent kind of fraud arises from a false statement or misrepresentation made, or caused to be made, that is material to entitlement or payment under the Medicare Program....Fraud may take such forms:....[as}Altering claim forms, electronic claim records, medical documentation, etc., to obtain a higher payment amount.**

It is axiomatic that billing CMS for supplies not provided constitutes Medicare fraud. Similarly, billing CMS for a product different from the product actually provided constitutes Medicare fraud.

95.    That NSS, through its actions as pled during the relevant time period and in light of these provisions of the MPIM, has committed Medicare Fraud

96.    That by regulation and instruction, CMS confirms it is a condition of payment for pharmacy drug claims that the NDC of the drug dispensed be reported in the PDE Record. CMS states that the NDC of the drug dispensed "must be submitted on the PDE records for payment." Every drug has its own unique NDC and it is a violation of CMS's condition of payment for a pharmacy to submit a claim with a NDC other than the NDC of the drug dispensed.

97.    That NSS through its actions as pled did just that and during the relevant time period has violated this condition of payment.

98.    That similarly, the correct NDC is a statutory and regulatory condition of payment for Medicaid claims and rebate. 42 U.S.C. § 1396r-8(a)(7)(C). Every state recognizes this: *"The NDC submitted to Medicaid must be the actual NDC number on the package or container from which the medication was administered. It is considered a fraudulent billing practice to bill using an NDC other than the one administered."*

99.    That NSS has violated this Medicaid condition of payment through its fraud as pled at least during the relevant time period as pled

100.    That this means pharmacies cannot bill CMS for one manufacturer's product while in fact dispensing another.

101.    That if CMS had audited NSS and discovered the pharmacy was systematically responsible for the submission of PDE claims with NDCs different from the NDC of the medication dispensed, CMS would deny the claims and insist on repayment.  It is a 100% overpayment situation because such PDEs never should have been submitted and paid in the first place.  Submitting a PDE with a false NDC constitutes a false claim because it is billing CMS for a product not dispensed and in violation of a CMS condition of payment.

102.    That thus, the NDC of the manufacturer on the prescription label and the NDC of the manufacturer of the medication dispensed must match.  If the manufacturer's NDC on the label of the medication dispensed to the patient does not match the NDC of the dispensing manufacturer, CMS cannot and should not be billed as if they did match.  To do so  is to submit a false claim.

103.    That NSS directly or indirectly during the relevant time period as pled submitted such false claims as described in ¶ 101.

**WHY NSS SUBSTITUTES LOWER COST GENERICS IN LIEU OF THE MAINTENCE PRESCRIPTION DRUG AS ORDERED DURING THE TRANSITION PERIOD TO TCGRX DISPENSING**

104.    That a generic drug may be manufactured by several different manufacturers and each manufacturer has its own unique NDC for that same drug.  A particular generic drug therefore has different NDCs, each NDC referring to a different manufacturer.

105.    That NSS aggressively shops for the lowest-priced generic versions of drugs and thus changes manufacturers on a frequent basis.  When the manufacturer of a generic drug changes, the NDC changes as well.  When a pharmacy such as NSS, instantly, decides to use a manufacturer for a generic drug that is different from the manufacturer NDC on the prescription label, it creates a non-match between the NDC on that label and the NDC for the product actually dispensed.  This would ordinarily be immediately detected by automated label verification when

the medication is dispensed by the TCGRX, or through visual verification by the NSS-employed pharmacist staff.

106.    That instantly, the Relator discovered the NSS fraud through the latter mechanism during the transitional period prior to federal insured's dispensing being converted to the TCGRX.

107.    That by using less expensive generic medications in the transition period, prior to the patient's maintenance medications being converted to automatic processing via TCGRX, NSS was able and did bill/claim for more expensive medications than those actually dispensed.

108.    That the substitution of a less-expensive generic medication, albeit the same medication prescribed for the patient/Federal Healthcare Program beneficiary, translated into a financial bonanza for NSS in dispensing non-matched drugs literally more than a hundred times daily during the period of time pled.  Further this scam has now operated at least since 2011 and involves likely in excess of thousands of patient/insureds, who were victimized until NSS transitioned them to TCGRX dispensing, Relator believing that thereafter, those patients received the medication for which they were actually billed.

109.    That the fraud was perpetrated at all NSS locations, nationwide.

110.    That transitional medications were at times the correct generic but dispensed from a larger lot size and/or were short-dated (that is about to expire), encompassing a lower fixed acquisition cost and resulting in another mechanism for financial windfall for NSS at the Government and its taxpayer's expense, same still leading to a false claim.

## HOW NSS' FALSE CLAIMS JEOPARDIZE
## PATIENT SAFETY

111.    That NSS' dispensing non-matched NDC medications is recklessly unsafe in many ways.  Secretly substituting a different NDC drug for the NDC drug on the prescription

label strips patients of the protection provided by FDA patient-level drug recalls, enables

potentially fatal allergic reactions and potentially interferes with clinical efficacy and safety.

## FDA PATIENT LEVEL DRUG RECALLS

112.    That drug recalls are taken to remove a drug product from the market.  Recalls are

ordered by the FDA or done on a manufacturer's own initiative.  The FDA classifies recalls in

accordance with 21 C.F.R. § 7.41.  A Class 1 recall, the most serious, is ordered when there is a

reasonable probability that the use of, or exposure to a certain product will cause death or serious

irreversible adverse health consequences.  Of the Class I recalls between 2004 and 2011, 40%

were because of contaminated drugs, 25% were because of wrong doses or release mechanisms

and 35% were due to product mislabeling.  In most quarters, there are well in excess of 100 drug

recalls, potentially impacting patients receiving NSS' fraudulently substituted medications.

113.    That in order for patients/federal payer insureds to benefit from recalls of

potentially deadly drugs, the prescribing physician must be aware that the patient is taking the

defective drug.  The NSS scam strips patients of that protection by secretly substituting a

different NDC medication for the NDC prescribed drug on the label.  Because no healthcare

personnel are aware that the patient is taking that particular medication (which may have been

recalled), there is no ability to protect the patient from its harmful effects.

114.    That NSS' fraudulent actions as pled during the relevant time period indicate a

wanton lack of concern for patient safety related to such recalls deserving of maximal penalties.

## ADVERSE DRUG REACTIONS AND ALLERGIES

115.    That different manufacturers of the same drug have different prices, different

packaging sizes and different ingredients.  Different manufacturers use different excipients and

dyes.  These cannot be considered inert molecules and patients who are allergic to certain of

these cannot take a medication from a manufacturer which uses those substances in their products. Reactions to those agents can range from rash to anaphylaxis to death.

116.    That physicians and pharmacists cannot protect patients from such adverse events when a different NDC drug has been substituted for the medication actually prescribed and referenced on the label.

117.    That NSS fraudulent actions as pled during the relevant time period indicate a wanton lack of concern for patient safety related to such allergic and adverse drug reactions.

## INTERFERENCE WITH CLINICAL EFFICACY AND/OR SAFETY

118.    That the potency and bioequivalence of generic drugs is compared to the brand drug and not to one another.

119.    That the FDA considers a generic drug to be interchangeable with a brand name drug if the generic is the "pharmaceutical equivalent" to the brand. A generic is the pharmaceutical equivalent if it has the same active ingredient strength, same route of administration and dosage, and same bioequivalence. The FDA allows the potency of a generic drug to fall within a bioequivalent range of 80% to 125% of the name brand drug.

120.    That pharmaceutical equivalence is not therapeutic equivalence. Different generic drugs have different shapes, release mechanisms, and excipients (colors, flavors, preservatives), all of which lead to differences in their bioavailability (i.e., their potency or rate of absorption). Switching from a generic at the top of the acceptable range to a generic at the bottom of that range increases the potential for clinical efficacy problems and serious adverse side effects.

121.    That this is because once a patient is stabilized on one generic, switching to a different generic can precipitate a subclinical effect, or an adverse safety event, by under or over dosing, putting the safety of the patient/insured at risk. This is most notable for medications with a narrow therapeutic range (that is with a minimum difference between minimum toxic and

minimum effective concentration) where small changes in the potency or changes in the rate of absorption can change the serum concentration and result in serious therapeutic failures or adverse drug reactions. There is no assurance of comparable dosing in a switch from one generic to another, underscoring the recklessness of NSS in ignoring patient safety solely for profit-driven purposes. All its claims submitted during the period of the fraud must be impliedly certified as false.

122.    That NSS, fully aware of the potential consequence of its scheme and despite clear implications as to patient safety, has perpetrated the fraud at the expense of the United States of America and its taxpayers for over seven years.

123.    That NSS' fraudulent actions as pled during the relevant time period indicate a wanton lack of concern for patient safety related to clinical efficacy and narrow therapeutic ranges incumbent in certain medications deserving of the most severe penalties.

## CLAIMS FOR RELIEF

## FOR A FIRST CAUSE OF ACTION

### VIOLATION OF FALSE CLAIMS ACT (31 U.S.C. §3729(a)(1)(A))
### Claims for Payment in Violation of the False Claims Act

That Relator reaffirms and realleges the heretofore pled paragraphs as if set forth fully verbatim as related to this specific claim.

124.    That this is a civil action by Relator Reynold A. McClain, RPh, acting on behalf of and in the name of the United States of America, against Defendant NSS for treble damages and monetary penalties pursuant to the FCA, 31 U.S.C. §§ 3729-33, as amended.

125.    That from at the latest early 2011 and up to and including summer 2018 when this matter was served upon NSS, a period of at least over seven (7) years, but likely far longer, Defendant NSS, through the above-pled acts and omissions, knowingly caused to be presented for payment and approval, false and/or fraudulent claims to officers of the United States Government.

As a result of this illegal activity, these claims were improper in whole pursuant to 31 U.S.C. § 3729(a)(1)(A).

126.    That with specificity and particularity, Relator pleads the who, what, where, when and how of the following false claims, being aware of literally thousands more perpetrated using the same modus operandi, by in all cases, corporate employees of NSS from its Greenville SC office:

a.    That on 8/17/2017, NSS dispensed Valproic Acid 250 mg to a federally-insured patient at NHC-Sumter on order of Maye Dubois, MD, having an NDC of 0378-5813-77 when in reality NSS claimed, was reimbursed and overpaid under the fraudulently-submitted NDC 69452-0150-20.  This was a short-dated formulation scheduled to expire on 10/17/2017;

b.    That on 8/18/2017, NSS dispensed Valsartan 80 mg to a federally-insured patient at NHC-North Augusta on order of an unknown provider having an NDC of 0591-4012-01 when in reality NSS claimed, was reimbursed and overpaid under the fraudulently-submitted NDC 43547-0368-09.  This was a short-dated formulation scheduled to expire on 11/30/2017;

c.    That on 8/24/2017, NSS dispensed Melatonin 3 mg to a federally-insured patient at NHC-Sumter on order of Maye Dubose, MD, having an NDC of 51991-014-06 when in reality NSS claimed, was reimbursed and overpaid under the fraudulently-submitted NDC 96295-0128-27;

d.    That on 8/28/2017, NSS dispensed Quinapril HCL 80 mg to a federally-insured patient at NHC-North Augusta on order an unknown provider having an NDC of 69097-841-05 when in reality NSS claimed, was reimbursed and overpaid under the fraudulently-submitted NDC 68180-0507-09;

e.    That on 9/15/2017, NSS dispensed Sodium Bicarbonate 650 mg to a federally-insured patient at NHC-Sumter on order of Maye Dubose, MD, having an NDC of 64980-182-

illegible when in reality NSS claimed, was reimbursed and overpaid under the fraudulently-submitted NDC 64980-0294-10.  This was also labeled as a short-dated formulation scheduled to expire quickly;

      f.      That on 10/19/17, NSS dispensed Aspirin 81 mg to a federally-insured patient at NHC-Garden City on order of an unknown provider having an unknown NDC which cannot be identified, but is fraudulent, was reimbursed and overpaid under the fraudulently-submitted NDC 49781-0084-99.  This was a short-dated formulation scheduled to expire on 11/30/2017;

      g.      That on 10/24/2017, NSS dispensed Valsartan 80 mg to a federally-insured patient at NHC-Garden City on order of an unknown provider having an NDC of 0591-4012-01 when in reality NSS claimed, was reimbursed and overpaid under the fraudulently-submitted NDC 43547-0368-09.  This was a short-dated formulation scheduled to expire on 11/30/2017;

      h.      That on 11/1/2017, NSS dispensed Amlodipine 10 mg to a federally-insured patient at NHC-Garden City on order an unknown provider having an unidentified NDC when in reality NSS claimed, was reimbursed and overpaid under the fraudulently-submitted NDC 69097-0128-15;

      i.      That on 11/2/2017, NSS dispensed Lisinopril 10 mg to a federally-insured patient at NHC-Garden City on order of an unknown provider having an NDC of 68180-981-03 when in reality NSS claimed, was reimbursed and overpaid under the fraudulently-submitted NDC 00172-3760-60.  This was a short-dated formulation scheduled to expire on 11/30/2017;

      j.      That on 12/26/2017, NSS dispensed Vitamin B12 1000 mg to a federally-insured patient at NHC-Sumter on order of Maye Dubose, MD, having an unknown, unclaimed NDC when in reality NSS claimed, was reimbursed and overpaid under the fraudulently-submitted NDC 0904-4217-13;

k.    That on 1/11/18, NSS dispensed Amlodipine 5 mg to a federally-insured patient at NHC-Garden City on order of an unknown provider having an NDC of 69097-837-15 when in reality NSS claimed, was reimbursed and overpaid under the fraudulently-submitted NDC 69097-15; and

l.    That on 2/1/2018, NSS dispensed Benzonatate 100 mg to a federally-insured patient at NHC-Laurens on order of C. Nelson, MD, having an NDC of 67877-015 when in reality NSS claimed, was reimbursed and overpaid under the fraudulently-submitted NDC 67877-0573-05.

m.    That as to the above false claims and in virtually all of the thousands of additional false claims of which he is aware, NSS affixed a disclaimer that "This is the same medication you have been getting.  Color, size and shape may appear different."

127.    That Federal Healthcare Program officials, their contractors, carriers, intermediaries and agents, paid and approved these and the thousands of other false claims for payment by NSS for such services that should not have been paid or approved, NSS never reporting the overpayment.

128.    That Defendant NSS through the means described above, deliberately and intentionally and despite Relator's pleading with James "Jimmy" Sain, from 2014 until his retaliatory termination in 2016, submitted, caused to be submitted, or assisted, or supervised the submission of fraudulent claims to the Federal Payer Programs, their officials, contractors, carriers, intermediaries and agents, in order to induce payment of the false and fraudulent claims by the Government.

129.    That the Federal Healthcare Program officials, their contractors, carriers, intermediaries and agents, would not have paid the claims for medications or services, nor otherwise reimbursed or advanced monies to Defendant NSS had they known the truth as to those claims' falsity.

130.    That as a result of its plan and scheme, Defendant NSS received payments far in excess of those established for the medications they fraudulently dispensed during the billed insured's transition periods prior to patients being dispensed their maintenance medications through the TCGRX system.

131.    That Defendant NSS concealed its illegal activities from the United States of America in an effort and for the specific purpose of defrauding the United States of America into paying Federal Payer claims that it otherwise would not have paid.  Their submission of FEHBP, Medicare, TriCare, and Medicaid claims involved a representation and certification that NSS would abide by and had abided by, and that it would adhere and had adhered to all of the statues, rules and regulations governing the Federal Healthcare Programs, which here it did not.

132.    That as a result of the conduct of Defendant NSS as pled *supra*, it has knowingly presented, or caused to be presented to an officer or employee of the United States of America, false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A).

133.    That by reason of the above-described presentment of false and fraudulent claims by NSS and its fraudulent certification and additionally impliedly falsely-certified claims , the United States has suffered significant losses in an amount to be determined.

134.    That the Government is entitled to treble damages based upon the amount of damages sustained by the United States of America as a result of violations of 31 U.S.C. §3729(a)(1)(A) by Defendant NSS.

135.    That the Government is entitled to a civil penalty between $5,500.00 and $11,000.00 as required by 31 U.S.C. §3729(a)(1) for each fraudulent claim submitted by Defendant NSS, of which, by Relator's estimate would exceed at a minimum, several thousand claims, notwithstanding any imposition of a "tainted claims" approach through implied false

certification (which is deserved and would increase that number) as has been recognized in some jurisdictions and under federal case law.  Same should be applied here.

136.    That Relator by information and belief, believes this scheme is being perpetrated through other NSS locations nationwide, with this claim and those following, thereby applicable to all of those entities in their respective jurisdictions as well.

137.    That Relator is also entitled statutorily to reasonable attorney's fees and costs, pursuant to 31 U.S.C. §3730(d), hereby requesting same.

## FOR A SECOND CAUSE OF ACTION

### VIOLATION OF FALSE CLAIMS ACT (31 U.S.C. §3729(a)(1)(B))
#### Use of False Records or Statements

That Relator reaffirms and realleges the heretofore pled paragraphs as if set forth fully verbatim as related to this specific claim.

138.    That this is a claim for treble damages and monetary penalties pursuant to the False Claims Act, 31 U.S.C. § 3729-3733, as amended.

139.    That through the above-described acts and omissions, and since at least early 2011 up to and including the Defendant's being served with Relator's Complaint, Defendant NSS knowingly made, used, or caused to be made or used false records or statements to get a false or fraudulent claim paid or approved by the government to the damage of the United States of America in violation of 31 U.S.C. §3729(a)(1)(B).  As a result of this illegal activity, Defendant NSS knowingly presented, or caused to be presented to an officer or employee of the United States of America, false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1).

140.    That Federal Healthcare Program officials, their contractors, carriers, intermediaries and agents, paid and approved the above-pled false claims for payment submitted

by NSS using fraudulent CMS 1500 forms either electronically or on paper, for such services that should not have been paid or approved.

141.    That Defendant NSS through the means described above, deliberately and intentionally and despite Relator's caution and requests that the practice cease, submitted, caused to be submitted, or assisted, or supervised the electronic and/or paper submission of fraudulent claims to the Federal Payer Programs, their officials, contractors, carriers, intermediaries and agents, in order to induce payment of the false and fraudulent claims.

142.    That the Federal Healthcare Program officials, their contractors, carriers, intermediaries and agents, would not have paid NSS' claims for medications not actually dispensed to their insureds, or otherwise reimbursed, or advanced monies to the Defendant had they known the truth as to those claims' falsity.

143.    That the United States of America has been damaged by reason of the above-described presentment of false records and statements in an amount to be determined.

144.    That the Government is entitled to treble damages based upon the amount of damages sustained by the United States of America as a result of violations of law by these Defendants

145.    That the Government is entitled to a civil penalty between $5,500 and $11,000 as required by 31 U.S.C. §3729(a)(1) for each fraudulent claim of Defendant NSS, of which, by Relator's estimate would exceed at a minimum, several thousand claims, notwithstanding any imposition of a "tainted claims" approach (which would increase that number) as has been recognized in some jurisdictions.

146.    That Relator believes that this scheme is being perpetrated through other NSS locations nationwide, with this claim thereby applicable to all of those entities in their respective jurisdictions as well.

147.    That Relator is also entitled statutorily to reasonable attorney's fees and costs, pursuant to 31 U.S.C. §3730(d), hereby requesting same.

## **FOR A THIRD CAUSE OF ACTION**

### **VIOLATION OF FALSE CLAIMS ACT (31 U.S.C. §3729(a)(1)(G))**
### **Use of False Record or Statement to Conceal a Payment Obligation**

That Relator reaffirms and realleges the heretofore pled paragraphs as if set forth fully verbatim as related to this specific claim.

148.    That this is a claim for treble damages and monetary penalties pursuant to the False Claims Act, 31 U.S.C. § 3729-3733, as amended.

149.    That Relator alleges that in performing the acts hereinbefore set forth, Defendant NSS knowingly made, used, or caused to be made and/or used false records or statements in order to conceal, avoid and/or decrease the Defendant's obligation to pay or transmit monies of to offer certain reimbursement to the Federal Healthcare Programs to the damage of the United States of America in violation of 31 U.S.C. §3729(a)(1)(G).

150.    That with particularity, NSS in the case of the thousands of false claims it generated, submitted for payment by the Government, later receiving reimbursement directly or indirectly for same from the Government, certified that "the claims data" submitted was "accurate, complete and acknowledged that it understood the claims data will be used for the purpose of obtaining Federal reimbursement."

151.    That in certifying compliance as above-pled, NSS used those false records or statements in order to conceal, avoid and/or decrease its obligation to pay or transmit monies to offer reimbursement and a reason for same to the Federal Healthcare Programs in violation of 31 U.S.C. § 3729(a)(1)(G).

152.    That by reason of the above-described false records or statements, the United States of America has been damaged in the amount of all overpayments it has made to NSS as a result of the violation of the False Claims Act in an amount to be determined.

153.    That the Government is entitled to treble damages based upon the amount Of damages sustained by the United States of America as a result of violations of law by these Defendants.

154.    That the government is entitled to a civil penalty between $5,500 and $11,000 as required by 31 U.S.C. §3729(a)(1) for each fraudulent claim of Defendant NSS, of which, by Relator's estimate would exceed at a minimum, several thousand claims, notwithstanding any imposition of a "tainted claims" impliedly falsely certified claims approach (which would increase that number significantly) as has been recognized in federal case law.  That approach should be applied instantly.

155.    That Relator believes that this scheme is being perpetrated through other NSS locations nationwide, with this claim thereby applicable to all of those entities in their respective jurisdictions.

156.    That Relator is also statutorily entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. §3730(d), hereby requesting same.

### FOR A FIFTH CAUSE OF ACTION

**VIOLATION OF FALSE CLAIMS ACT (31 U.S.C. § 3730(h))**
**Individual Retaliation Involving Terms and Conditions of Employment**
**as to Relator McClain**

That Relator reaffirms and realleges the heretofore pled paragraphs as if set forth fully verbatim as related to this specific claim.

157.    That Relator was at all time relevant to the allegations in this Complaint, an employee of Defendant NSS, who after learning of the fraudulent claims and scheme alleged

herein confronted his employer, demanding that said practices, and other areas of concern be addressed in that they represented illegal, fraudulent claims potentially leading to liability behalf of NSS.

158.    That despite Sain informing Relator in 2014 that it would remedy the fraudulent claims scheme if given thirty (30) days, Defendant NSS refused to change its fraudulent billing practices and address the procedure it utilized to transition new patients into the dispensing of their maintenance prescription medications by the TCGRX system.

159.    That in 2014 and on multiple occasions into 2016, Relator specifically alleged to Sain and Adams that NSS was involved in the submission of false claims, not generalized misconduct, all the time realizing based upon his knowledge of the scheme previously used by *Omnicare*, that a cause of action would lie in NSS' fraudulent activities.

160.    That knowing that Defendant NSS was violation the FCA, Relator's actions in bringing the fraud to the attention of Sain in 2014 and then persisting with his complaints as to same over the next 2 years was an effort to stop the multiple daily violations of the FCA he witnessed, all the time as he considered legal action under FCA.  As such he was engaging in protected activity under 31 U.S.C. §3730(h)(1).

161.    That Relator particularly addressed the fraudulent use of incorrect NDCs in the billing of the federal payer programs when the patient/insureds were actually receiving medication having a different NDC, the potential impact on patient safety, the need to correct the situation and NSS' potential liability to the Government in doing so.

162.    That Sain admitted the scheme as pled and perpetrated, acknowledging erroneous NDC, submission of same reduced to claims that were subsequently paid, yet did not specifically term the claims false or fraudulent.

163.    That thereafter, over a period of two years, in response to his protected activity, expressed through these requests to correct the claims fraud and repeated notices of the fraud to management and in light of their being refused, Relator was chastised and subjected to an objectively hostile work environment, harassed, threatened and discriminated against in his attempt to simply accurately identify, understand and stop  the fraudulent claims and certain practices jeopardizing proper patient care.

164.    That later Relator was terminated based upon pretextual allegations (his receiving a non-steroidal drug from a fellow employee) that were not the actual reason he was terminated.

165.    That in calendar year 2015, NSS falsely accused Relator of diverting medications, some controlled from its Greenville facility, telling Relator that certain employees were being investigated, yet to his knowledge, he was the only such employee pretextually suspected.

166.    That as a result thereof, Relator was wrongfully and pretextually subjected to a polygraph examination wherein he answered all questioned honestly with a result inconsistent with falsity.

167.    That despite no indication of falsehood on polygraphy, NSS continued to pretextually harass the Relator in his workplace, while he continued to protest NSS' ongoing fraud in its submission of false claims to the Government and actual excess remuneration as a result thereof.

168.    That in 2016, Defendant NSS, by way of Sain, who was actually in violation of the S.C. Pharmacy Practice Act himself, filed a Pharmacy Board Complaint against the Relator, same summarily dismissed.

169.    That Sain on behalf of NSS, in terminating Relator, at that point a long-term employee with good performance reviews, was attempting to discredit Relator, destroy his

career, wrongfully color his license before the Pharmacy Board and generally injure his credibility should he publish his knowledge of the NSS fraud as pled.

170.     That based upon the above, Relator has been adversely affected in the terms and conditions of his employment by Defendant NSS because of lawful acts by way of protected activity  as contemplated by § 3730(h)(1) by him in furtherance of this action at law to recover monies properly due to the United States of America, or at a minimum prevent further submission of false claims to it under similar circumstances.

171.     That the totality of Relator's identification, investigation, notice to NSS and attempted remediation of the scheme wherein the latter (via Sain) sought to maximize its profits at the expense of the United States of America , tax payers and its federal insureds particularly through violations of 31 U.S.C. §3729(a)(1) in its relevant subparts as pled, was the proximate cause and cause in fact of his being terminated as an employee of NSS.

172.     That as such and under this section, Relator is entitled to all relief necessary to make him whole. Such relief shall include an offer of reinstatement with the same seniority status he would have had, but for the discrimination he was subjected to and his later termination based upon his attempt to remedy the fraud, twice the amount of back pay based upon his prior compensation rate, interest on the back pay, and compensation for any and all special damages sustained as a result of his termination, including litigation costs and reasonable attorneys' fees.

**WHEREFORE**, Relator, on behalf of himself and the United States Government, pursuant to 31 U.S.C. §3730(c)(5) and (d) prays as follows:

 (a)     That this Court enter judgment against Defendant NSS in an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's actions, plus a civil penalty of $5,500 - $11,000 for each action in violation

of 31 U.S.C. §3729, and the costs and expenses of this action, with prejudgment interest, including the costs to the United States Government for its expenses related to this action;

(b)    That if this action proceeds through the Relator, or if the United States Government proceeds with any alternative remedy that Relator be awarded an amount the Court decides is reasonable for collecting the civil penalty and damages, that being no less than 30% of the proceeds of this action and/or any alternative remedy and/or the settlement of any such claim(s);

(c)    That the United States Government and Relator receive all relief from Defendant, both at law and at equity, to which they may reasonably appear entitled, including all litigation costs and reasonable attorneys' fees incurred by the federal government and the Relator as provided pursuant to 31 U.S.C. § 3730(d) and other applicable law;

(d)    That the Court compel a complete accounting from Defendant NSS of all Federal Healthcare Program beneficiaries who were victimized by its fraudulent billing scheme, thereafter applying the relevant civil monetary penalty to each applicable claim submitted on those beneficiaries' accounts;

(e)    That Defendant NSS be penalized under the implied false certification theory, deeming all its federal healthcare claims for payment, subsequently reimbursed and collected during the period of the ongoing fraud as false claims for purposes of calculating an equitable civil monetary penalty (with Relator receiving his appropriate share thereof); and for

(f)    Such further relief as the Court deems just and proper.


Respectfully submitted,

                                        **HINNANT MEDICAL & LAW OFFICES, LLC**
                                        **ATTORNEYS AND COUNSELORS AT LAW**

                                        *s/ C. William Hinnant, Jr. MD JD FCLM*

                                        _____
                                        C. William Hinnant, Jr. MD JD FCLM
                                        Federal ID No. 9129

112 Essex Drive
Anderson, SC 29621
(864) 226-6132, Fax: (864) 226-2320

**ATTORNEY FOR RELATOR**

Dated: March 15, 2019
Anderson, South Carolina